THE ETHELRED.

(District Court, E. D. Pennsylvania. .September 11, 1899.)

1. MASTER AND SERVANT—INJURY TO SEAMAN—UNSAFE APPLIANCES—NEGLIGENCE OF MATE.
     Libelant, a seaman, who had just signed and reported for duty on board a steamer, fell, and was injured, by reason of the breaking of a rope which he was directed by the mate in charge to use to support him while washing down the mast. The rope had been in use for a number of voyages, and had been in a position where it was exposed to injury from heat and smoke, but during the preceding voyage had been subjected to no strain, to test its strength. *Held* that, in failing to test it before directing its use, the mate was guilty of negligence for which the vessel was liable.

2. SAME—CONTRIBUTORY NEGLIGENCE.
     As the appearance of the rope did not indicate its weakness, and libelant had no knowledge of the length of time it had been in use, he was not negligent in obeying the mate's orders without question.

In Admiralty.

J. Warren Coulston and Alfred Driver, for libelant.

Thomas Leaming and Henry R. Edmunds, for respondent.

McPHERSON, District Judge. This is a libel in rem to recover damages for personal injuries caused by the alleged negligence of the master of the steamship Ethelred. The facts are as follows: The libelant, who is an able seaman, 28 years of age, signed articles on August 15, 1898, for a voyage from the port of Philadelphia to Jamaica and return. The Ethelred is a British steamship, and upon the day named had just arrived from Jamaica, and was moored to a dock at the foot of Race street. The libelant went on board about noon, with his cousin, Taylor, who had shipped at the same time, and reported for duty to the first mate, who was then the master of the vessel, the captain being on shore. Within an hour afterwards the mate ordered the mainmast to be washed down by one of the two men, and Arbery undertook the work, Taylor being thereupon assigned to another duty. In order to wash the mast down, it was necessary to hoist the libelant to the proper position by means of a rope, to be rove through a block that was fastened to the mast about 30 feet from the deck. The mate testifies that a gantline with a boatswain's chair is ordinarily used for such a purpose,—a gantline being a loose rope kept in the lazarette. This may be the usual practice, but it was not followed upon the day in question. The mate ordered Arbery to use the staysail halyard, a three-inch rope belonging to the vessel's running rigging, which is made fast at the forward end to the head of the sail, passes through the block already referred to, and at the other end is fastened to a belaying pin at the side of the shrouds. In obedience to this order, Arbery unbent the halyard from the sail, and fastened a boatswain's chair to the free end. He was then hoisted to the proper position by a seaman named Collins, who had been ordered by the mate to attend upon Arbery, and to lower him from time to time as the work should progress. The libelant began his task, washed about three feet of the mast, was lowered

by Collins, washed about three feet more, and was again lowered, the rope being safely fastened to the pin. The libelant had scarcely begun to clean this third section, when the rope broke between him and the block, and he fell to the deck, sustaining the injuries complained of. Thus far no negligence of the master appears, and negligence is ordinarily not to be inferred merely from the fact of injury. It is alleged, however, that the halyard had become unfit for the use to which it was put; and that, while its unfitness may not have been apparent upon a casual inspection, the master is nevertheless chargeable with knowledge that it was not safe. This is the point of the case, for, if the defect was latent, and if such inspection and test as the ship was bound to make under the circumstances presently to be stated would not have disclosed the defect, the breaking of the rope must be held to have been an accident, for which the libelant cannot recover. The respondent has offered no evidence about the age of the rope, and it may therefore safely be assumed that it was not new. It had certainly been in use upon the round voyage between Philadelphia and Jamaica that immediately preceded the voyage just completed, and (considering the respondent's failure to throw light upon its age) had probably been used for a longer time. The position of the halyard was just aft of the funnel, where it was exposed to smoke and heat, and occasionally to sparks or flame, especially when the wind was ahead. In such a situation the life of a rope may be very short. At the best it can hardly be long, and the plain duty of the ship was to exercise a reasonable inspection, in order to be sure that the rope continued to be safe. If the staysail had been in frequent use, and the rope had shown no sign of giving way under the strain of hoisting the sail, the test of ordinary use would probably have been sufficient. But no such test had recently been applied; the staysail had not been set during the round voyage just finished from Philadelphia to Jamaica and return, and no trial of the rope's strength had been made since the voyage preceding. Upon that voyage an adequate test had been made. The sail had been hoisted, and two men, weighing together more than 400 pounds, had swayed on the rope to take in the slack, thus affording convincing proof that it was then capable of sustaining much more weight than the body of the libelant, even if he had been heavier than the testimony shows. Since then, however, no test had been made. The sail had not been set; the vessel had had "a good deal of head winds— northerly winds"—as she was coming from the south to the north, and the rope had therefore been unusually exposed to the heat and smoke from the funnel. In consequence, it was "covered with smoke," as the libelant says, or "appeared to be smoke-burned," in the language of the mate, and, as the event proved, was unsafe for the use to which it was put.

Upon these facts, I think the master was negligent in failing to have the halyard tested before the libelant used it. I agree that the appearance of the rope did not suggest that it was obviously dangerous. The color would not arrest attention, for the ropes on a ship are usually much discolored, and to the ordinary observer there was

nothing else to suggest danger. Arbery had no reason to suspect weakness. He had just come on board. He knew nothing about the age of the rope, or the tests to which it had been put, or the degree of exposure that had just been undergone. He was not put upon guard by obvious defects, and was not bound, even in port, to decline to obey the mate's order until he had seen the rope tried sufficiently to convince him of its strength. He was, therefore, not negligent in obeying orders without hesitation or question. But the mate was under a different obligation. He was bound to exercise reasonable care to furnish a safe rope, and I think that reasonable care, under the facts already detailed, required him to test the rope in controversy before the libelant used it. Having failed to do so, the ship must be held liable. This is not the case of a latent defect, undiscoverable by reasonable inspection; it is the case of a defect that might fairly be anticipated in the usual course of events, and a defect that was susceptible of discovery by an easy test. Failure to test was negligence, and the result was that the master negligently furnished his servant with an unsafe appliance.

One—perhaps more than one—of the small bones in the libelant's right foot was broken and some of the ligaments of the left foot were severely strained, probably being torn loose from the bone. He suffered severe pain for a considerable time, was in a hospital for several months, and had not fully recovered in April, 1899, when the testimony of Dr. Northrop was taken. His right foot is well, but the left foot has not yet regained its strength. At best it is likely to be months, probably a year or two, before he can do the full ordinary work of a man of his age, and he may be unfitted to follow the sea hereafter. His wages as a seaman were $20 per month. I do not think the testimony justifies me in finding that he has been permanently disabled, but I am satisfied that there will be some degree of disability for a considerable time, and that he may be obliged either to give up the sea, or to follow it in some other capacity than as an able seaman.

My conclusion is that the libelant is entitled to recover damages for the vessel's negligence, and that the amount of the decree should be $1,200.